2007 OK CR 12

**Richard Eugene GLOSSIP, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D 2005–310.

Court of Criminal Appeals of Oklahoma.

April 13, 2007.

Silas R. Lyman, II, Wayne Woodyard, Capital Trial Division, Indigent Defense System, Norman, OK, attorneys for defendant at trial.

Connie Smothermon, Gary Ackley, Assistant District Attorneys, Oklahoma County, Oklahoma City, OK, attorneys for the State at trial.

Janet Chesley, Kathleen M. Smith, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth B. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

LEWIS, Judge.

¶ 1 Appellant, Richard Eugene Glossip, was charged with the First Degree (malice) Murder in violation of 21 O.S.Supp.1996, § 701.7(A), on January 14, 1997, in Oklahoma County District Court Case No. CF–97–244. The instant appeal arises from a trial occurring in May and June 2004, before the Honorable Twyla Mason Gray, District Judge.[1] The State filed a Bill of Particulars and alleged, during sentencing, the existence of two aggravating circumstances: (1) that the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration; and (2) the existence of the probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.2001, § 701.12(3) and (7).

¶ 2 The jury found Glossip guilty of first degree (malice) murder, found the existence of the murder for remuneration aggravating circumstance, and set punishment at death. Judge Gray formally sentenced Glossip in accordance with the jury verdict on August 27, 2004.

### I. FACTS

¶ 3 In January of 1997, Richard Glossip worked as the manager of the Best Budget Inn in Oklahoma City, and he lived on the premises with his girlfriend D–Anna Wood. Justin Sneed, who admitted killing Barry Van Treese, was hired by Glossip to do maintenance work at the motel.

¶ 4 Barry Van Treese, the murder victim, owned this Best Budget Inn and one in Tulsa. He periodically drove from his home in Lawton, Oklahoma to both motels. The Van

---

1. In his first trial, Glossip was convicted and the jury found the existence of two aggravating circumstances. The jury found (1) that the killing was especially heinous, atrocious, and cruel; (2) that the appellant would pose a "continuing threat" to society and recommended a penalty of death. On direct appeal, the convictions and sentences were reversed. *See Glossip v. State,* 2001 OK CR 21, 29 P.3d 597.

Treese family had a series of tragedies during the last six months of 1996, so Mr. Van Treese was only able to make overnight visits to the motel four times in that time span. His usual habit was to visit the motel every two weeks to pickup the receipts, inspect the motel, and make payroll.

¶ 5 The State presented testimony about the physical condition, financial condition, and the day to day operations of the motel. At the beginning of 1997, Mr. Van Treese decided to do an audit of both motels after it was determined that there were shortfalls. Before Mr. Van Treese left for Oklahoma City, Donna Van Treese, Barry's wife, calculated Glossip's net pay at $429.33 for the period ending January 5th, 1997, because Glossip had $211.15 in draws.[2] On January 6, 1997, she and Mr. Van Treese reviewed the books and discovered $6,101.92 in shortages for the Oklahoma City motel in 1996. Mrs. Van Treese testified her husband intended to ask Glossip about the shortages.

¶ 6 Sometime in December, Mr. Van Treese told Billye Hooper, the day desk manager, that he knew things needed to be taken care of, and he would take care of them the first of January. Hooper believed Van Treese was referring to Glossip's management of the motel.

¶ 7 Justin Sneed, by all accounts, had placed himself in a position where he was totally dependent on Glossip. Sneed started living at the motel when he came to Oklahoma City with a roofing crew from Texas. Sneed quit the roofing crew and became a maintenance worker at the motel. He made no money for his services, but Glossip provided him with a room and food. Sneed admitted killing Mr. Van Treese because Glossip offered him money to do it. The events leading up to the killing began with Van Treese's arrival at the motel on January 6.

¶ 8 Van Treese arrived at the Best Budget Inn in Oklahoma City on January 6, 1997, around 5:30 p.m. Around 8:00 or 9:00 p.m., Van Treese left Oklahoma City to go to the Tulsa Best Budget Inn to make payroll and collect deposits and receipts. Hooper testi-fied Van Treese was not upset with Glossip and did not say anything to her about shortages before he left for Tulsa. Van Treese did tell Hooper he planned to stay for a week to help remodel rooms.

¶ 9 William Bender, the manager of the Tulsa motel, testified that Mr. Van Treese was very upset. He had never seen him that angry. Van Treese inspected the daily report for the motel, and he checked to see if the daily report matched rooms actually occupied. He told Bender that there were missing registration cards, missing receipts and unregistered occupants at the Oklahoma City motel.

¶ 10 He told Bender that he told Glossip that he had until Van Treese arrived back at Oklahoma City to come up with the missing receipts. Then he was going to give Glossip another week to come up with the missing registration cards and to get the receipts in order. He also told Bender that if Glossip were fired Bender would manage the Oklahoma City motel. Van Treese left the Tulsa motel and arrived back at the Oklahoma City motel at about 2:00 a.m. on January 7.

¶ 11 Sneed, also known as Justin Taylor, testified that in exchange for maintenance work, Glossip let him stay in one of the motel rooms. Sneed said he only met Van Treese a few times, and he saw him at the motel with Glossip on the evening of January 6, 1997. Sneed testified that around 3:00 a.m. on January 7, 1997, Glossip came to his room. Glossip was nervous and jittery. Glossip wanted Sneed to kill Van Treese and he promised him $10,000.00 for killing Van Treese. Sneed testified that Glossip had asked him to kill Van Treese several times in the past and the amount of money kept getting bigger and bigger.

¶ 12 Glossip suggested that Sneed take a baseball bat, go into Van Treese's room (room number 102), and beat him to death while he slept. Glossip said that if Van Treese inspected the rooms in the morning, as he intended to do, he would find that none of the work had been done. Glossip told

---

2. Glossip's salary was $1,500.00 per month, which was divided twice monthly. The net amount was after other usual deductions.

Sneed that both of them would be out of a job.

¶ 13 Sneed went over to the Sinclair Station next door and bought a soda and possibly a snack. He then went back to his room and retrieved the baseball bat. Sneed said he went to Van Treese's room and entered using a master key that Glossip had given him. Van Treese woke up and Sneed hit him with the bat. Van Treese pushed Sneed, and Sneed fell into the chair and the bat hit and broke the window. When Van Treese tried to get away, Sneed threw him to the floor and hit him ten or fifteen times. Sneed also said that he pulled out a knife and tried to stab Van Treese a couple of times, but the knife would not penetrate Van Treese. Sneed received a black eye in the fight with Van Treese. He later told others that he fell in the shower and hit his eye.

¶ 14 A long time resident of the motel, John Beavers, was walking outside when heard strange noises coming from room 102. He then heard the glass breaking. Beavers believed there was a fight going on in room 102.

¶ 15 After Sneed killed Van Treese he went to the office and told Glossip he had killed Van Treese. He also told him about the broken window. Sneed said that he and Glossip went to room 102 to make sure Van Treese was dead. Glossip took a $100 bill from Van Treese's wallet.

¶ 16 Glossip told Sneed to drive Van Treese's car to a nearby parking lot, and the money he was looking for would be in an envelope under the seat. Glossip also told him to pick up the glass that had fallen on the sidewalk.

¶ 17 Sneed retrieved the car keys from Van Treese's pants and drove Van Treese's car to the credit union parking lot. He found an envelope with about $4000.00 cash under the seat. He came back and swept up the glass. He put the broken glass in room 102, just inside the door. He said that Glossip took the envelope from him and divided the money with him. He also testified that Glossip helped him put a shower curtain over the window, and he helped him cover Van Treese's body. According to Sneed, Glossip told him, that if anyone asked, two drunks got into a fight, broke the glass, and we ran them off. Sneed testified that Glossip told him to go buy a piece of Plexiglas for the window, and some Muriatic acid, a hacksaw, and some trash bags in order to dispose of Van Treese's body.

¶ 18 D–Anna Wood testified that she and Glossip were awakened at around 4:00 a.m. by Sneed. She testified that Glossip got out of bed and went to the front door. When he returned, Glossip told her that it was Sneed reporting that two drunks got into a fight and broke a window. She testified that Glossip then returned to bed.

¶ 19 Glossip told police during a second interview, that Sneed told him that he killed Van Treese. He denied ever going into room 102, except for assisting with repairing the window. He said he never saw Van Treese's body in the room.

¶ 20 The next morning, Billye Hooper arrived at work and was surprised to see that Glossip was awake. She also noticed that Mr. Van Treese's car was gone. She asked Glossip about the car, and Glossip told her that Mr. Van Treese had left to get supplies for remodeling rooms. A housekeeper testified that Glossip told her to clean the upstairs rooms, and he and Sneed would take care of the downstairs, where room 102 was located.

¶ 21 Later that afternoon, employees found Mr. Van Treese's car in a credit union parking lot near the motel, and a search for Van Treese began. Glossip and D–Anna Wood were at Wal–Mart shopping. They returned to the motel, because Hooper paged them and told them to come back. The police were contacted sometime after Mr. Van Treese's car was found.

¶ 22 Cliff Everhart, who worked security for Mr. Van Treese in exchange for a 1% ownership, was already at the motel. He told Sneed to check all of the rooms. Sneed indicated that he did so. Everhart, Glossip and Wood drove around looking for Van Treese in nearby dumpsters and fields.

¶ 23 Everhart and Oklahoma City Police Sgt. Tim Brown began discussing Glossip's conflicting statements, so they decided to

check room 102 on their own. At about 10:00 p.m. they discovered Van Treese's body in his room. Sneed had already left the motel that afternoon, and he was not apprehended until a week later. Glossip was taken into custody that night, questioned and released. The next day, Glossip began selling his possessions. He told people he was leaving town. However, before he could leave town, he was taken into custody again for further questioning.

¶ 24 Subsequent searches revealed that Sneed possessed approximately $1,700.00 in cash, and that Glossip possessed approximately $1,200.00. Glossip claimed this money came from his paycheck and proceeds from the sale of vending machines and his furniture.

## II: VOIR DIRE ISSUES

¶ 25 Glossip claims, in proposition nine, that the trial court committed errors during voir dire. Glossip is not claiming that he was forced to keep an unacceptable juror, but that the trial court abused its discretion in removing some jurors for cause. The first claim regards the method the trial court used in determining whether jurors had the ability to impose the death penalty.

¶ 26 Glossip attacks the trial court's use of the question whether jurors could give "heartfelt consideration to all three sentencing options." Glossip argues that this question is at odds with the uniform question "can you consider all three legal punishment options—death, imprisonment for life without parole or imprisonment for life—and impose the one warranted by the law and evidence?" *See* OUJI–CR 2d 1–5 (1996). Regardless of the language used, Glossip must show that the alleged improper language affected his trial in a negative way.

¶ 27 Glossip claims his trial was unfair because this incorrect language caused two jurors, who had reservations about the death penalty, to be erroneously excused because they expressed an inability to consider all three punishment options equally. One of these jurors stated, "I would not be able to give the death penalty equal consideration as a sentencing option."

¶ 28 The trial court asked this juror, "So your reservations about the death penalty are such that regardless of the law or the facts or the evidence, you would not consider imposing a penalty of death." The juror, unequivocally answered, "That's correct." She was then removed for cause without objection.

¶ 29 The next juror Glossip mentions stated that she wanted to do her "civic duty," but was having "a problem with the death penalty." The trial court also asked this juror, "do you believe that your concerns about the death penalty are such that regardless of the law and the evidence, you would not be able to give equal consideration to all three sentencing options." This juror, stated, "I do." This juror was removed for cause without objection from trial counsel.

¶ 30 Glossip complains about the use of the language "equal consideration" used by the trial court, parroted by the first juror and repeated by the trial court to the second juror. Glossip claims that this Court has never required "equal consideration" be given to all three sentencing options. *See Frederick v. State*, 2001 OK CR 34, ¶¶ 52–53, 37 P.3d 908, 926–27.

¶ 31 However, despite the holding in *Frederick*, this Court has held, in *Jones v. State*, 2006 OK CR 17, ¶ 14, 134 P.3d 150, 155, that "A major purpose of *voir dire* in a capital case is to reveal whether jurors will consider all three punishment options equally. A juror who cannot should be excused for cause." *See also Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 48 (cited in *Jones, supra* ).

¶ 32 The proper standard for determining when prospective jurors may be excluded for cause because of their views on capital punishment is whether their views would prevent, or substantially impair, the performance of their duties as jurors in accordance with the instructions and their oath. *See Ledbetter v. State*, 1997 OK CR 5, ¶ 4, 933 P.2d 880, 885; *also see Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

¶ 33 This standard does not require that a prospective juror's incompetence to serve be established on the record with "un-

mistakable clarity." *Wainwright,* 469 U.S. at 424–25, 105 S.Ct. at 852. We must give great deference to trial judges in matters regarding jury selection. *See Patton v. State,* 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281–82; *Ledbetter,* 933 P.2d at 885.

■ ¶ 34 In the present case, because there was no objection to the removal of these two jurors, any error must rise to the level of plain error. Here there is no such error. The first juror was unequivocal in her statement that she could not impose the death penalty. The second juror expressed concerns about her ability to impose the death penalty at a very early stage in the voir dire process stating that she couldn't impose death. This juror asked for more time to consider whether she would consider the death penalty if the law and facts warranted such a penalty. She vacillated back and forth and finally stated that she could not consider the death penalty equally. We find that based on the entire voir dire, the trial court did not abuse its discretion in removing these two jurors.

■ ¶ 35 In this proposition, Glossip also claims that a person serving a deferred sentence was improperly removed for cause. This juror raised her hand and later approached the bench when the trial court inquired whether anyone had "ever been charged with or accused of a crime." She was not completely honest with the trial court, until the trial court indicated that it knew about this juror's history of two different deferred sentences, one of which she was currently serving. The trial court expressed concern about the juror's ability to be fair and impartial in a criminal case when she, herself, had been prosecuted by the State. This juror agreed that it bothered her, and asked "what can I do about it?"

¶ 36 This juror agreed that she would be better suited for a non-criminal case. Before excusing her for cause, the trial court allowed defense counsel to object. The trial court stated that it had "a real problem with people who are on a deferred sentence sitting as jurors. They've got a lot at stake...." Although the trial court made a blanket statement about all persons currently serving a deferred sentence, the trial court believed this juror would be biased because she was currently serving a deferred sentence. The trial court, did not abuse its discretion in finding that this juror could not be fair and impartial and removing her for cause.

## III: FIRST STAGE ISSUES

¶ 37 In proposition one, Glossip claims that the State presented insufficient evidence to convict him of first degree murder. Glossip claims that Justin Sneed's testimony was not sufficiently corroborated. Glossip also claims that the State's evidence regarding motive was flawed.

■ ¶ 38 When the sufficiency of evidence is challenged on appeal, this Court will determine, whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *See Easlick v. State,* 2004 OK CR 21, ¶ 5, 90 P.3d 556, 559. This test is appropriate here where there was both direct evidence and circumstantial evidence supporting the conviction. *See Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203.

■ ¶ 39 For Glossip to be convicted as a principal in Van Treese's murder, the State had to establish that he either committed each element of first degree malice murder or that he aided and abetted another in its commission. 21 O.S.2001, § 172. Aiding and abetting requires the State to show "the accused procured the crime to be done, or aided, abetted, advised or encouraged the commission of the crime." *Spears v. State,* 1995 OK CR 36, ¶ 16, 900 P.2d 431, 438. Direct evidence supporting Glossip's commission of the crime came from admitted accomplice Justin Sneed.

■ ¶ 40 There is no question that Justin Sneed was an accomplice to the murder of Barry Van Treese, and for Glosssip's conviction to stand Sneed's testimony must be corroborated by some other evidence tending to connect Glossip with the commission of the crime. *Spears,* 1995 OK CR 36, ¶ 27, 900

P.2d at 440; 22 O.S.2001, § 742.[3] Even entirely circumstantial evidence may be sufficient to corroborate an accomplice's testimony. *Pierce v. State*, 1982 OK CR 149, ¶ 6, 651 P.2d 707, 709; *see also Wackerly v. State*, 2000 OK CR 15, ¶ 23, 12 P.3d 1, 11.

¶ 41 To be adequate, the corroborative evidence must tend in some degree to connect the defendant to the commission of the offense charged without the aid of the accomplice's testimony. Even slight evidence is sufficient for corroboration, but it must do more than raise a suspicion of guilt. *Cullison v. State*, 1988 OK CR 279, ¶ 9, 765 P.2d 1229, 1231.

¶ 42 If the accomplice's testimony is corroborated as to one material fact by independent evidence tending to connect the accused to the commission of the crime, the jury may infer that the accomplice speaks the truth as to all. *Fleming v. State*, 1988 OK CR 163, ¶ 8, 760 P.2d 208, 210; *Pierce*, 1982 OK CR 149, ¶ 6, 651 P.2d at 709. However, corroborative evidence is not sufficient if it requires any of the accomplice's testimony to form the link between the defendant and the crime, or if it tends to connect the defendant with the perpetrators and not the crime. *Frye v. State*, 1980 OK CR 5, ¶ 31, 606 P.2d 599, 606–607.[4] The jury was properly instructed, according to the law in effect at the time of trial, on accomplice testimony and corroboration of the testimony.[5]

¶ 43 In this case, the State presented a compelling case which showed that Justin Sneed placed himself in a position where he was totally dependent on Glossip. Sneed testified that it was Glossip's idea that he kill Van Treese. Sneed testified that Glossip promised him large sums of cash if he would kill Barry Van Treese. Sneed testified that, on the evening before the murder, Glossip offered him $10,000 dollars if he would kill Van Treese when he returned from Tulsa. After the murder, Glossip told Sneed that the money he was looking for was under the seat of Van Treese's car. Sneed took an envelope containing about $4,000.00 from Van Treese's car. Glossip told Sneed that he would split the money with him, and Sneed complied. Later, the police recovered about $1,200.00 from Glossip and about $1,700.00 from Sneed. The most compelling corroborative evidence, in a light most favorable to the State, is the discovery of the money in Glossip's possession. There was no evidence that Sneed had independent knowledge of the money under the seat of the car. Glossip's actions after the murder also shed light on his guilt.

¶ 44 The State points out four other aspects of Glossip's involvement, other than the money, which point to his guilt: motive, concealment of the crime, intended flight, and, as alluded to earlier, his control over Sneed.

¶ 45 Glossip claims that the State's evidence of motive was unsubstantiated and disputed. However, the State presented sufficient evidence to show that Glossip feared that he was going to be fired as manager, because the motel accounts had shortages during the end of 1996. Cliff Everhart told Mr. Van Treese that he thought that Glossip was "pocketing a couple hundred extra" every week during the quarter of 1996. Billye Hooper shared her concerns about the motel with Van Treese. Van Treese told her that he knew he had to take care of things. It was understood that Van Treese was referring to Glossip's management.

¶ 46 The condition of the motel, at the time of Van Treese's death, was deplorable. Only half of the rooms were habitable. The entire motel was absolutely filthy. Glossip was the person responsible for the day to day opera-

---

3. "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof." 22 O.S.2001, § 742.

4. *See also, Jones v. State*, 2006 OK CR 5, ¶ 33, 128 P.3d 521, 537–38; *Pink v. State*, 2004 OK CR 37, ¶ 16, 104 P.3d 584, 590–91.

5. We note that the jury was given uniform jury instruction OUJI–CR (2d) 9–32 (2000 Supp.). After this trial occurred, this Court, in *Pink*, (*supra* footnote 4) amended OUJI–CR (2d) 9–32. *Pink*, 2004 OK CR 37, ¶ 23, 104 P.3d at 593. Glossip does not raise any issue regarding this instruction. We find that the giving of the pre-*Pink* instruction did not affect the outcome of this trial.

tions of the motel. He knew he would be blamed for the motel's condition.

¶ 47 The State concedes that motive alone is not sufficient to corroborate an accomplice's testimony. *See Reed v. State,* 744 S.W.2d 112, 127 (Tex.Cr.App.1988).[6] However, evidence of motive may be considered with other evidence to connect the accused with the crime. *Id.* Glossip's motive, along with evidence that he actively concealed Van Treese's body from discovery, as well as his plans to "move on," connect him with the commission of this crime. Evidence that a defendant attempted to conceal a crime and evidence of attempted flight supports an inference of consciousness of guilt, either of which can corroborate an accomplice's testimony. *See People v. Avila,* 38 Cal.4th 491, 43 Cal.Rptr.3d 1, 133 P.3d 1076, 1127 (2006); *also see Smith v. State,* 245 Ga. 168, 263 S.E.2d 910, 911–12 (1980) (evidence that a party attempted to conceal his participation in a crime is sufficient to corroborate the testimony of an accomplice).

¶ 48 The State presented an enormous amount of evidence that Glossip concealed Van Treese's body from investigators all day long and he lied about the broken window. He admitted knowing that Sneed killed Van Treese in room 102. He knew about the broken glass. However, he never told anyone that he thought Sneed was involved in the murder, until after he was taken into custody that night, after Van Treese's body was found. Glossip intentionally lied by telling people that Van Treese had left early that morning to get supplies. In fact, Van Treese was killed hours before Glossip claimed to have seen Van Treese that morning. Glossip's stories about when he last saw Van Treese were inconsistent. He first said that he last saw him at 7:00 a.m.; later he said he saw him at 4:30 a.m. Finally, he said he last saw him at 8:00 p.m. the night before Van Treese's death, and he denied making other statements regarding the time he last saw Van Treese.

¶ 49 Glossip also intentionally steered everyone away from room 102. He told Billye Hooper that Van Treese had left to get materials, and that Van Treese stayed in room 108 the night before. He told Jackie Williams, a housekeeper at the motel, not to clean any downstairs rooms (which included room 102). He said that he and Sneed would clean the downstairs rooms. He told a number of people that two drunken cowboys broke the window, and he tried to implicate a person who was observed at the nearby Sinclair station as one of the cowboys.

¶ 50 He told Everhart that he would search the rooms for Van Treese, and then he told Sneed to search the rooms for Van Treese. No other person searched the rooms until seventeen hours after the murder, when Van Treese's body was discovered.

¶ 51 The next day, Glossip began selling all of his belongings, before he admitted that he actively concealed Van Treese's body. He told Everhart that "he was going to be moving on." He failed to show up for an appointment with investigators, so the police had to take him into custody for a second interview where he admitted that he actively concealed Van Treese's body. He said he lied about Sneed telling him about killing Van Treese, not to protect Sneed, but because he felt like he "was involved in it."

¶ 52 Glossip argues that all of this evidence merely proves, at best, that he was an accessory after the fact. Despite this claim, a defendant's actions after a crime can prove him guilty of the offense. Evidence showing a consciousness of guilt has been used many times.[7]

¶ 53 Here, all of the evidence taken together amounts to sufficient evidence to, first, corroborate Sneed's story about Glossip's in-

6. *Also see Leal v. State,* 782 S.W.2d 844, 852 (Tex.Cr.App.1989); *Ex Parte Woodall,* 730 So.2d 652, 660, fn. 2 (Ala.1998); *Goodin v. Commonwealth,* 256 Ky. 1, 75 S.W.2d 567, 570 (1934).

7. *See Dodd v. State,* 2004 OK CR 31, ¶¶ 33–34, 100 P.3d 1017, 1031 and cases cited therein (post crime suicide attempt, also mentioning attempting to bribe or intimidate a witness and flight or concealing oneself from authorities); *Anderson v. State,* 1999 OK CR 44, ¶ 11, 992 P.2d 409, 415 (attempting to influence a witness's testimony, mentioning altering, concealing or removing evidence from a crime scene citing *Camron v. State,* 1992 OK CR 17, ¶ 22, 829 P.2d 47, 53).

volvement in the murder, and, second, the evidence sufficiently ties Glossip to the commission of the offense, so that the conviction is supported.

¶ 54 In proposition two, Glossip claims that the State presented irrelevant and highly prejudicial evidence during the first stage of trial. He claims that the State attempted to elicit sympathy for the victim and for Sneed. However, trial counsel failed to object to any of the testimony Glossip now claims was improper. Therefore, he has waived all but a review for plain error. *Coddington v. State*, 2006 OK CR 34, ¶ 52, 142 P.3d 437, 451–52. Plain error is that error which goes to the foundation of the case or takes away a right which is essential to a defendant's case. *Mitchell v. State*, 2005 OK CR 15, ¶ 47, 120 P.3d 1196, 1209.

¶ 55 Glossip first argues that the testimony of Donna Van Treese, the victim's spouse was irrelevant to the first stage of trial. He ties this testimony with the introduction of the "in-life" photograph, which was met with an objection.

¶ 56 Donna Van Treese, during first stage, described the victim as a fifty-four year old man, who had quit smoking six years prior, had gained weight, was balding, and had gray hair. He grew a full white beard and when he shaved it off; his daughter cried and begged him to grow it back. The "in-life" photograph shows Mr. Van Treese without the beard.

¶ 57 Mrs. Van Treese was allowed to testify that the months prior to his death, a series of tragedies had occurred which included the death of her mother. After this death the family took a long trip in a motor home to several States. During this trip Mr. Van Treese felt an urgent need to get home. When they arrived home, they learned that Mr. Van Treese's mother was scheduled for heart by-pass surgery that very morning. She did not survive the surgery.

¶ 58 The purpose of this testimony was to show why Mr. Van Treese was not involved in the day to day operations of the motel in the months preceding his death. It was meant to show how the motel could slip into physical and financial disrepair without his knowledge.

¶ 59 During the first stage, several witnesses described Mr. Van Treese as a loving, kind, and generous person who on many occasions allowed people to stay at the motel when they were down on their luck. This testimony was coupled with evidence that Mr. Van Treese had a temper and would explode with anger towards employees. Although this testimony may have been irrelevant to the first stage, it did not rise to the level of plain error. This evidence did not deprive Glossip of a fair trial.

¶ 60 Evidence that Mr. Van Treese was a ham radio operator was relevant to the identification of his vehicle, as the vehicle was found at the credit union parking lot with an amateur radio operators personalized license plate. The evidence about his diabetes was relevant to show why Mrs. Van Treese called people to initiate a search as soon as she heard about him being missing, and to explain why the discovery of his car was troublesome.

¶ 61 In this proposition, Glossip also claims that the State introduced irrelevant evidence he claims was intended to evoke sympathy for Justin Sneed. The defense theory was that Sneed killed Mr. Van Treese without any influence from Glossip. They presented this theory in opening statement by first describing Sneed as a remorseless, confessed killer, and then, throughout the opening, presented a story showing how Sneed acted alone.

¶ 62 The State portrayed Sneed as a person with low intellectual ability, and a child like demeanor. They presented testimony about his background, and his growing up in a single parent home, having a child early in life, dropping out of school after the eighth grade, coming to Oklahoma City with a roofing crew, and quitting that to work at the motel in exchange for rent. This was all meant to show how he placed himself in a position to be dependent on Glossip. Although there was some lay opinion evidence regarding whether Sneed had the personality that would allow him to kill Mr. Van Treese on his own, this testimony comprised only a

small portion of the State's case. This testimony did not rise to the level of plain error.

¶ 63 Next, in this proposition, Glossip claims that the State introduced irrelevant evidence regarding the remedial measures taken after Mr. Van Treese's death to show the condition of the motel. Glossip argues that this evidence was an indictment on the way Mr. Van Treese ran the motel, rather than relevant to show that Glossip had a reason to kill Mr. Van Treese.

¶ 64 The evidence included testimony that Mr. Van Treese's brother Kenneth Van Treese bought new towels and linens for the motel, replaced forty mattresses, and disposed of broken furniture. It was brought out during this testimony that Glossip never had the authority to buy new linens and towels. There was plenty of evidence that the motel was not in good repair when Mr. Van Treese died. Glossip could have believed that he would be fired because of the condition of the motel, whether he was responsible for the condition or not. The evidence was admissible and the jury could give it whatever weight they thought appropriate. There is no error here.

¶ 65 In proposition three, Glossip claims that the State used demonstrative aids to overly emphasize certain portions of witnesses' testimony. He claims that the posters (1) placed undue influence on selected testimony, (2) were the equivalent of continuous closing argument, and (3) violated the rule of sequestration. Glossip also claims that the trial court erred in refusing to include the posters as part of the trial record.

¶ 66 We will, first, address the trial court's exclusion of these demonstrative aids as part of the record. Defense counsel requested that these poster sized note sheets

be preserved by the trial court for appellate review, but the trial court refused the request. Then defense counsel requested that they be allowed to photograph the exhibits for their own records, but again the trial court refused. The trial court insisted that everything that the prosecutor wrote on the pads was in the record; however, the analysis of the pages in the transcript where notations were made tells a different story. We are extremely troubled by the trial court's attitude toward defense counsel's attempt to preserve the demonstrative aides for appellate review.[8]

¶ 67 While it is incumbent on the moving party to make a sufficient record so that this Court can determine the content and extent of these documents, the trial court must allow counsel to make sufficient proffer so that the issues can be preserved. *See Ross v. State*, 1986 OK CR 49, ¶ 18, 717 P.2d 117, 122. This Court will not assume error from a silent record.[9] However, this was not a case where evidence or testimony was not allowed to be introduced at trial.

¶ 68 This is a case where demonstrative aids were made by the prosecution, placed before the jury and utilized extensively during trial and closing argument. Even though these aids were utilized extensively during trial, the trial court rejected any attempt by defense counsel to preserve the "demonstrative exhibits" for future appellate review.

¶ 69 If a trial court is going to allow these types of demonstrative aids during trial, the trial court shall assume the responsibility of insuring that these aids are made a part of the record, as court's exhibits, when asked. The total recalcitrance of the trial court to allow a record to be made creates error in itself.

If the trial court denies testimony of a witness or admission of an exhibit, it is the responsibility of the party offering the testimony or evidence to ensure a sufficient record is made to allow this Court to review the issue on appeal. This can be accomplished by requesting and conducting an *in camera* hearing to present the evidence for the record or through an offer of proof of sufficient specificity to provide this Court with what it needs in order to review the claim of error.

8. Glossip has asked for an evidentiary hearing so that the record may be supplemented with these demonstrative exhibits, if they remain in existence; however, we find that the inclusion of the demonstrative exhibits would not affect our decision in this case.

9. *Welch v. State*, 1998 OK CR 54, ¶ 41, 968 P.2d 1231, 1245. *See also Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 56 (Lumpkin, concurs in results):

¶ 70 Here, the only way to determine what was on the posters, *in toto,* is to search the record and note where it appears that the prosecutor was writing on the note pad. According to the record cited, the prosecutor made notes of significant testimony on a large flip chart sized easel pad. This pad was left up for the jury to view during trial over trial counsel's objection which was made after the second day of testimony.

¶ 71 The record is not clear whether these pads stayed up during the entire trial. Glossip asserts that they stayed on display from witness to witness from the first day of testimony to the last with no citation to the record. Glossip cannot say what was written on the poster sized pad sheets. (Trial counsel apparently informed appellate counsel that there were twelve of these poster sized note sheets plastered around the courtroom at the conclusion of the trial).

¶ 72 Glossip claims that the posters were "taped up to various places in the courtroom and remained in full view of the jury and all subsequent witnesses throughout the trial." Glossip's citations to the record do not support this specific factual claim.

¶ 73 Glossip admits that he has found no cases on point in Oklahoma, and only cites to a Kentucky case that he cites as saying,

It is one thing to allow a party to make a chart or summary or other demonstrative aid for use while a witness is testifying. It is quite another 'to allow a particular segment of testimony to be advertised, billboard fashion,' after that witness has completed his or her testimony.

*Lanning v. Brown,* 377 S.W.2d 590, 594 (Ky. 1964). The chart displayed in *Lanning* was a poster sized chart noting the list of special damages claimed by the party in a personal injury case. The Court held that the display of the chart was harmless, because the damages were not in substantial dispute. The Kentucky court noted a dearth of precedent on this point.

¶ 74 In *Miller v. Mullin,* 354 F.3d 1288, 1295 (10th Cir.2004), the Court noted a risk of using transparencies during closing argument. The court noted that "[a]n inherent risk in the use of pedagogical devices is that

they may 'unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.'" *Id., citing United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984).

¶ 75 In viewing the entire record, we cannot say that the posters affected the outcome of this trial. Both sides utilized the poster tactic during trial, although, the State seemed to utilize more posters than the defense. There is no argument that the posters did not contain factual information, and they were utilized to assist the jury in understanding the testimony, considering the trial court's instructions against note-taking. Any error in the utilization of these posters was harmless.

¶ 76 In proposition ten, Glossip claims that the statute allowing an "in-life" photograph of the homicide victim is unconstitutional on its face and the photograph was inadmissible because any relevance was substantially outweighed by the danger of harm.

¶ 77 Glossip's claim challenges the constitutionality of the amended 12 O.S.Supp.2003, § 2403, arguing the admission of an "in-life" photograph without regard to relevance or the evidentiary balancing test violates due process. Glossip maintains that the blanket admissibility of such photographs unnecessarily risks exposing jurors to prejudicial information. This issue was thoroughly discussed in *Coddington v. State,* 2006 OK CR 34, ¶¶ 53–57, 142 P.3d at 452–53. In *Coddington* this Court upheld the first-stage admission of a single, pre-mortem photograph of the victim.

¶ 78 The legislature has seen fit to make the admission of a photograph of the victim while alive relevant in a homicide case "to show the general appearance and condition of the victim while alive." 21 O.S.Supp.2003, § 2403.

We presume that a legislative act is constitutional; the party attacking the statute has the burden of proving that it is not.... We construe statutes, whenever reasonably possible, to uphold their constitutionality.... A statute is void only when it is so vague that men of ordinary intelli-

gence must necessarily guess at its meaning. . . .

*Hogan v. State*, 2006 OK CR 19, ¶ 63, 139 P.3d 907, 930 [citations omitted] (discussing this same issue regarding admission of an "in life" photograph during second stage).

¶ 79 Contrary to Glossip's claim, § 2403 only allows the admission of one "appropriate" photograph. 12 O.S.Supp.2003, § 2403. We held, in *Hogan*, that photographs which violate the balancing test of § 2403 would be inadmissible. *Hogan*, 2006 OK CR 19, ¶ 64, 139 P.3d at 931; *see Coddington*, 2006 OK CR 34, ¶ 56, 142 P.3d at 452–53. Here, the State offered, in the first stage, an innocuous portrait of Van Treese, taken during the September preceding his death. The photograph was offered "to show the general appearance and condition of the victim while alive" in accordance with the statute. Other than the fact that Barry Van Treese had a beard at the time of his death, the photograph depicted his appearance just before his death. The photograph met the guidelines of the statute, and its probative value was not substantially outweighed by the danger of unfair prejudice.

 ¶ 80 The admission of this evidence, as with all evidence, is reviewed under an abuse of discretion standard. The introduction of evidence is left to the sound discretion of the trial court; the decision will not be disturbed absent an abuse of that discretion. *Pickens v. State*, 2001 OK CR 3, ¶ 21, 19 P.3d 866, 876. An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946. The trial court did not abuse its discretion in admitting the photograph.

## IV: PROSECUTORIAL MISCONDUCT

 ¶ 81 In proposition four, Glossip alleges several instances of what he calls prosecutorial misconduct. We first note that no trial will be reversed on the allegations of prosecutorial misconduct unless the cumulative effect was such to deprive the defendant of a fair trial. *Garrison v. State*, 2004 OK CR 35, ¶ 128, 103 P.3d 590, 612. Much of the allegations here were not preserved at trial with contemporaneous objections, thus we review for plain error. We will not find plain error unless the error is plain on the record and the error goes to the foundation of the case, or takes from a defendant a right essential to his defense. *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698.

 ¶ 82 Glossip's first series of claims attack the prosecution's argument as a misrepresentation of facts and misleading the jury. He first claims that the prosecutor committed misconduct when arguing that the absence of Glossip's fingerprints in room 102 amounted to evidence of guilt. There was no objection to these comments, thus we review for plain error only.

¶ 83 Here the prosecutor was merely arguing that, as manager of the motel and as a person who was responsible for repairs in every room, it was very suspicious that none of his fingerprints were found in the room. This was a fair inference from the evidence. The prosecutor was not arguing that Glossip selectively removed fingerprints after the crime, but was arguing that the absence of his fingerprints in the room, even ones that might have been left there under innocent circumstances was unusual. There is no plain error here.

¶ 84 Glossip next argues that the prosecution's argument that only Glossip, and not Sneed, had a motive to kill Mr. Van Treese amounted to misconduct. Again, defense counsel did not object. The State was merely arguing that Sneed had no reason to kill Mr. Van Treese other than the offer of money from Glossip. Again this is a fair inference from the evidence. There is no plain error here.

 ¶ 85 Next, Glossip argues that the prosecutor mislead the jury when arguing that the defense of "accessory after the fact" was baseless, because the State did not charge him with accessory after the fact to murder. In fact, the State did, initially charge Glossip with accessory to murder and Sneed with murder in separate Informations. The State then dismissed the accessory Information and added Glossip as a co-defendant with Sneed on the murder Information.

¶ 86 The State argued that it did not charge Glossip with accessory to murder, because he was guilty of the "big boy offense of Murder in the First Degree." Actually, the State did not pursue prosecution of Glossip for accessory, because they alleged he was guilty of first degree murder. The method of prosecution and the filing of charges is discretionary with the prosecution. Here the prosecutor is merely arguing that Glossip is guilty of murder, regardless of his defense that he only acted after the fact in attempting to cover up the crime. The argument, again, is properly based on the evidence adduced at trial.

¶ 87 The prosecutor argued that the lesser related offense instruction relating to accessory to murder was only given because defense counsel requested it. Glossip objected to this argument and the trial court admonished the prosecutor. Juries are to consider lesser related offenses, only if they have a reasonable doubt that a defendant has committed the greater offense. OUJI–CR 2d 10–27 (1996); *Graham v. State*, 2001 OK CR 18, ¶ 6, 27 P.3d 1026, 1027. The jury was properly instructed on the method of reviewing greater and lesser offenses. These instructions properly channeled the jury's decision making process and cured any error.

¶ 88 Glossip next argues that the prosecution attempted to elicit sympathy for the victim and his family during first stage of trial through evidence and argument. This argument relates to proposition two where Glossip argues that victim impact evidence was introduced through the testimony of first stage witnesses. Our resolution of proposition two also resolves this issue.

¶ 89 Next, Glossip argues that the prosecution introduced false or misleading testimony. This argument touches on the fact that the Tulsa motel was in just as much financial trouble as the Oklahoma City motel. Glossip argues that the prosecutor made an offer of proof that Van Treese was going to fire the Tulsa manager as well as Glossip, because of the shortages in Tulsa. Mrs. Van Treese testified that they were going to take care of the Oklahoma City motel first. However, the Tulsa manager, Bender, testified that Mr. Van Treese wanted to move him to the Oklahoma City motel. Glossip claims that both of these scenarios cannot be true, so the prosecution presented false evidence.

¶ 90 The fact that the Van Treeses discussed firing both managers was not in conflict with the fact that they were going to fire Glossip first, move Bender to the Oklahoma City motel to take Glossip's place while managers were sought for both motels. This claim has no merit.

¶ 91 Next, Glossip claims that the prosecutor implied that additional evidence existed. During the re-direct examination of witness Kayla Pursley, Glossip claims that the prosecutor inferred that this jury would not hear everything she said to the police because she could not remember what she told police. The prosecutor did not allow Pursley to refresh her memory with the police report and tell the jury what she told police. No objection was made to this questioning at trial.

¶ 92 As indicated by the State, this questioning was to rebut the defense's cross-examination where counsel brought up the fact that she testified to things not in the police report because she remembered these things after talking to the police. The prosecutor was merely attempting to show that Pursley was testifying from her memory and not from the police report. The fact that the jury was deprived of this evidence due to a lack of memory was not indicative of more evidence damaging to Glossip. This claim does not rise to the level of plain error.

¶ 93 Glossip also claims misconduct occurred during the penalty phase of trial. He first claims that the prosecutor misstated the law regarding the appropriate punishment by arguing that death is appropriate because society, the Van Treese family, the Glossip family, and the justice system is "worse off" because of Richard Glossip. The State also argued that Glossip was a "cold-blooded murderer" and "cold-blooded murders in the State of Oklahoma we punish with death." The prosecutor went on to argue that "He chose the option of murder in the face of other options and that makes death

the appropriate option." There were no objections to these arguments.

¶ 94 Glossip also cites to the prosecutor's argument inferring that no one would be here, except for the actions of Richard Glossip, including the statement, "you [the jury] wouldn't be here making this tough decision." Again there was no objection.

¶ 95 Glossip claims that the prosecutor unfairly denigrated Glossip's mitigating evidence by pointing out that while he is awaiting trial he gets his niece to come visit him so he can bring her to trial so she can testify. The prosecutor also pointed out the fact that other mitigation evidence was from a 23–year–old detention officer. The prosecutor pointed out the fact that Sneed was about that age and he buddies up to this young kid so he can have a witness to say he is not violent. There was no objection to this argument.

¶ 96 Defense counsel did object during the next citation of alleged misconduct. The prosecutor used the victim's photographs as props, placed them on defense table, and said "I don't have a problem with taking this blood and putting it right over here. Because this is where it goes." Counsel's objection was aimed at the prosecutor "throwing things on our table." Defense counsel said the prosecutor should give them to the jury. The objection was overruled. The objection was not based on the argument but on where the prosecutor was placing the photographs. Because he raises a different argument here, we can review for plain error only.

¶ 97 All of the alleged misconduct came during the State's second closing, after defense counsel stated that the State wants "Richard Glossip's blood to flow" (to which a State's objection was sustained). Defense counsel also told the jury that this was a

decision that they would have to live with; the State would put this case away and forget about it. Defense counsel also argued that the State sees Richard Glossip as a person with no social redeeming value—ignoring the fact that he had a normal life, was a hard worker and supported his family.

¶ 98 It must be noted, that the State alleged two aggravating circumstances: continuing threat; and murder for remuneration. Most of the argument, from both sides, was in an attempt to show whether Glossip was a continuing threat to society. The continuing threat aggravating circumstance requires a jury to determine whether it is probable that a defendant will commit future criminal acts of violence that would constitute a continuing threat to society.

¶ 99 All of the prosecutor's arguments were proper comments on the evidence in order to show that, based on the circumstances of this crime, Glossip was a continuing threat to society. Obviously, the jury did not accept the prosecutor's argument, because they did not find that Glossip was a continuing threat.

## V: INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 100 In proposition five, Glossip claims that he was denied effective assistance of counsel during both stages of trial.[10] In order to show that counsel was ineffective, Glossip must show both deficient performance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[11] In *Strickland,* the Court went on to say that there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the cir-

---

10. Glossip has filed a motion for evidentiary hearing based on this claim so that he might be able to supplement the record with certain evidence. The evidence contained in the motion for new trial consists of the video taped interview of Justin Sneed, a transcript of the interview, the financial records of the Best Budget Inns (Tulsa and Oklahoma City), and accompanying affidavits. This evidence does not contain sufficient information to show by clear and convincing evidence there is a strong possibility trial counsel

was ineffective for failing to utilize this evidence. See Rule 3.11(B)(3)(b), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006).

11. The *Strickland* standard continues to be the correct test for examining claims of ineffective assistance of counsel where counsel fails to utilize mitigation evidence. *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

cumstances, counsel's conduct constituted sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 101 To establish prejudice, Glossip must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 102 In the context of a capital sentencing proceeding, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

¶ 103 He first claims that counsel was ineffective for failing to utilize Justin Sneed's videotaped interview to impeach Sneed and Detective Bemo. Glossip points out that this Court, in our Opinion reversing Glossip's original conviction, stated that "[t]rial counsel's failure to utilize important impeachment evidence against Justin Sneed stands out as the most glaring deficiency in counsel's performance." *Glossip,* 29 P.3d at 601.

¶ 104 One would believe that if this Court stated an attorney was ineffective (to the point of requiring reversal) for failing to utilize one piece of evidence to impeach witnesses, the new attorneys on retrial would utilize the evidence. That is, unless counsel at the second trial is either banking on his ineffectiveness garnering his client another trial or he made a strategic decision not to introduce the tape and only question witnesses about the statements on the tape. The third possibility is that the failure to utilize this one piece of evidence is not the sole reason counsel was found to be ineffec-

tive during the first trial. This Court trusts that the first reason is invalid. Counsel's use of the contents of the tape to cross-examine witnesses, without introducing the tape, was a valid strategy. Furthermore, the failure to utilize the tape during the first trial was one of many reasons why this Court found there was ineffective assistance of trial counsel during the first trial.[12] Even though these two trials encompass the same subject, similar strategic decisions occurring during both trials, might not result in the same conclusion by this Court.[13]

¶ 105 The videotaped interview was not introduced into evidence during this trial, thus it is not a part of the record. Glossip has filed a motion for an evidentiary hearing pursuant to Rule 3.11, *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006), in order to supplement the record.

¶ 106 Glossip admits that trial counsel cross-examined both Sneed and Bemo regarding the circumstances of the interview, statements made during the interview and discrepancies between current testimony and statements on the tape. Counsel was not ineffective for utilizing this strategy.

¶ 107 Glossip next argues that trial counsel failed to utilize readily available evidence (other than the video tape mentioned above) to cross-examine witnesses. Glossip clams that counsel was ineffective for failing to utilize financial records concerning the victim's Tulsa motel to show that the "over $6,000.00 shortage" at the Oklahoma City motel was not unusual. Counsel did attempt to introduce this evidence, but the trial court ruled it inadmissible. Counsel did not try to impeach witnesses with the documents.

¶ 108 Part of the State's theory was that Glossip wanted Van Treese killed so he could take over the management of both motels: Oklahoma City and Tulsa. The State also presented evidence that Glossip was going to

---

**12.** Trial counsel during the first trial was wholly unprepared for trial, had not formulated any reasonable defense theory, and failed to object to clearly inadmissible evidence. *See Glossip,* 2001 OK CR 21, ¶ 25, 29 P.3d at 603.

**13.** During the first trial, trial counsel indicated he would use the tape to impeach Justin Sneed,

but when the time came, "counsel failed to utilize the video tape at all." *Glossip,* 2001 OK CR 21, ¶¶ 16–17, 29 P.3d at 601. In this case, trial counsel questioned both Bemo and Sneed about inconsistencies between prior statements and current testimony.

be confronted about the $6,000.00 shortage. Furthermore, evidence was presented that Glossip did not want Van Treese to discover the condition of the motel.

¶ 109 The shortages at the Tulsa motel, while relevant to show that the $6000.00 shortage was not unusual, was not relevant to show that Glossip intended to have Van Treese killed because he feared termination. His fear was based on the condition of the motel, the missing registration cards, and missing money at the Oklahoma City motel.

¶ 110 Glossip next claims that counsel was ineffective, because counsel failed to object to improper character evidence introduced by the State. This evidence concerned testimony about the character of Justin Sneed as a follower who would not have killed the victim unless someone put him up to it. When counsel did object, an objection was overruled and the State elicited testimony that Sneed "would have probably done anything for Glossip. He was that dependent on him."

¶ 111 Several witnesses observed Sneed and Glossip interact with each other. They testified that Sneed had no outside income and he appeared to be dependent on Glossip. This evidence was not character evidence. This was proper evidence presented so the jury could understand why Glossip was able to employ Sneed to commit the murders.

¶ 112 Next, Glossip claims that counsel was ineffective for failing to object to the evidence complained about in proposition two. We found above that this evidence did not rise to the level of plain error; we further find that the failure to object did not amount to ineffective assistance, as this evidence did not affect the outcome of the case.

¶ 113 Next, Glossip claims that counsel was ineffective to object to instances of prosecutorial misconduct set forth in proposition four. Any misconduct that might have occurred did not affect the outcome of this case, so there can be no ineffective assistance of counsel.

## VI: SECOND STAGE ISSUES

¶ 114 In proposition six, Glossip claims there was insufficient evidence to support the sole aggravating circumstance of murder for remuneration. Murder for remuneration, in this case, requires only that Glossip employed Sneed to commit the murder for payment or the promise of payment. 21 O.S.2001, § 701.12.

¶ 115 Here, Glossip claims that Sneed's self-serving testimony was insufficient to support this aggravating circumstance. Glossip claims that the murder was only a method to steal the money from Van Treese's car.

¶ 116 The flaw in Glossip's argument is that no murder needed to occur for Sneed and Glossip to retrieve the money from Van Treese's car. Because Glossip knew there would be money under the seat, a simple burglary of the automobile would have resulted in the fruits of their supposed desire. The fact is that Glossip was not after money, he wanted Van Treese dead and he was willing to pay Sneed to do the dirty work. He knew that Sneed would do it for the mere promise of a large payoff. There was no evidence that Sneed had any independent knowledge of this money.

¶ 117 There is sufficient evidence that Glossip promised to pay Sneed for killing Van Treese.

¶ 118 In proposition seven, Glossip claims that the jury instructions defining the jury's role in determining punishment were flawed. Glossip first argues that the jury should have been instructed, as requested by trial counsel, that the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt. He claims, relying on *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that the failure to give this instruction resulted in a death sentence that is unconstitutional and unreliable. This Court has consistently rejected this argument, and Glossip has presented no new argument which would cause this Court to reconsider our previous decisions. *See Mitchell v. State,* 2006 OK CR 20, ¶ 81, 136 P.3d 671, 704.

¶ 119 Glossip next argues that the trial court's instruction which defines mitigating evidence as factors which "in fairness, sym-

pathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" impermissibly narrows the characterization of mitigation. He claims this definition excludes evidence about a defendant that may warrant a sentence less than death, because the evidence may not lessen his moral culpability or blame. The trial court rejected trial counsel's requested instructions.

¶ 120 The trial court gave the uniform instructions on mitigating evidence, OUJI–CR 2d 4–78 and 4–79 (1996), as well as others, which included a list of mitigating evidence and additional instructions which allowed the jury to consider other mitigating circumstances if found to exist. This Court has previously analyzed these instructions and determined that they are appropriate. *Rojem v. State,* 2006 OK CR 7, ¶ 57, 130 P.3d 287, 299. This Court will not revisit the issue here.

■ ¶ 121 In proposition eight, Glossip claims that the State was allowed to introduce improper victim impact evidence. Oklahoma's desire to allow victims of violent crimes some type of influence in the sentencing of criminal defendants has led to different statutes. 22 O.S.2001, §§ 984 and 984.1 allows the use of "victim impact statements" and 21 O.S.2001, § 701.10(C) allows the use of "victim impact evidence."

¶ 122 Title 21 O.S.2001, § 701.10(C) pertains only to capital sentencing proceedings. The State may present "victim impact evidence" about the victim and the impact of the murder on the family of the victim. The clear language of section 701.10(C) limits the type of victim impact evidence allowable in a capital sentencing procedure. This section is not as encompassing as 22 O.S.2001, §§ 984 and 984.1. Section 984 reads in part:

"Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;

Section 984.1 states that,

Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentencing proceeding and present the statements orally. Provided, however, if a victim or any member of the immediate family or person designated by the victim or by family members of a victim wishes to appear personally, such person shall have the absolute right to do so.

22 O.S.2001, § 984.1(A). "Members of the immediate family" means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim. 22 O.S.2001, § 984.

¶ 123 This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." See 22 O.S.2001, § 984; *Dodd,* 2004 OK CR 31, ¶ 95, 100 P.3d at 1044.

¶ 124 However, evidence may be introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair" thus implicating the Due Process Clause of the Fourteenth Amendment. *Lott,* 2004 OK CR 27, ¶ 109, 98 P.3d at 346, *quoting Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

¶ 125 During the second stage the State presented two witnesses. These two witnesses, the victim's daughter and the victim's widow, met the definition of "immediate family members." These two witnesses read their own statements and statements of other immediate family members. Glossip now claims that this procedure violated our previous case law on victim impact evidence. Glossip argues that the State should have only been allowed to introduce testimony of immediate family members or present a representative to read all of the statements, not both. *See Lott v. State,* 2004 OK CR 27, ¶¶ 110–11, 98 P.3d 318, 347 (family members

may testify or they may designate a family representative to testify in their behalf). Intermingled in this proposition are comments that Mrs. Van Treese's statement was more akin to a statement made by a family representative, rather than a personal statement addressing the impact of the death on her personally. Glossip argues that either her statement should have been admitted as a representative, or the State should have presented the personal testimony of immediate family members, not both.

¶ 126 The issue here is whether an immediate family member can both testify on their own behalf and represent other members of the immediate family. In *Lott,* two members of the immediate family testified—the victim's son and daughter. Another witness also testified—the victim's granddaughter who was a "representative." She testified about the impact of the death on the entire family (even though she was not a member of the "immediate family"), her father and her aunts and uncles. (Her father and one of her aunts were the two witnesses who also presented victim impact evidence).

¶ 127 Glossip also cites *Grant v. State,* 2003 OK CR 2, ¶ 59, 58 P.3d 783, 797, *judgment vacated on different grounds in Grant v. Oklahoma,* 540 U.S. 801, 124 S.Ct. 162, 157 L.Ed.2d 12 (2003) [14] where this Court held that it is error for one person to read the statement of another. This Court, in Grant stated,

> In *Ledbetter v. State,* 1997 OK CR 5, ¶¶ 37, 933 P.2d 880, 893, we recognized the fact that "a person designated by the victim or by family members of the victim" may present victim impact statements. However, we held that the legislature intended that the "person chosen to present the victim impact statement" should use his "own thoughts or observations to express the impact of a death on survivors of the victim." *Ledbetter,* 1997 OK CR 5, ¶ 38, 933 P.2d at 893. In *Ledbetter,* our holding allowed the chosen person to observe family members and to use those observations in the statement; however, that person

may not receive aid in the composition of the statement from outside sources. *Ledbetter,* 1997 OK CR 5, ¶ 39, 933 P.2d at 893.

¶ 128 Nevertheless, in *Grant* we held that the error did not rise to the level of plain error as the evidence was presented in a more sterile manner than if each of the writers of the statements had taken the stand and read their own statements.

¶ 129 The State cites *Hooks v. State,* 2001 OK CR 1, ¶ 37, 19 P.3d 294, 313. In *Hooks,* this Court held that a representative, who is not an immediate family member, may be the representative, and if they give testimony about the impact of the murder on themselves, the testimony can be harmless where the testimony makes up a small part of the victim impact evidence. This Court went on to say that a family member can give victim impact testimony on behalf of several immediate family members, as long as that testimony is otherwise admissible.

¶ 130 Trial counsel objected to victim impact evidence in a pre-trial motion and hearing. During the second stage, an in camera hearing was held and the parties went through the statements. Defense counsel made objections to some of the language in some of the statements and the trial court redacted the statements. However, counsel specifically stated that he had no objection to the two witnesses reading the statements of the remaining "immediate family members." Therefore, any claim regarding the method of victim impact evidence presentation is waived, except that error which is plain error.

¶ 131 We find that Glossip was not harmed by the State's utilization of two family members to read the statements of five others. This Court will not second guess trial counsel's sound trial strategy. There is no plain error here.

### VII: MANDATORY SENTENCE REVIEW

¶ 132 We found above that there was sufficient evidence to support the finding of

---

**14.** Opinion on remand, *Grant v. State,* 2004 OK CR 24, 95 P.3d 178, *cert. denied* 543 U.S. 964, 125 S.Ct. 418, 160 L.Ed.2d 332 (2004).

the statutory aggravating circumstance of murder for remuneration. After reviewing the entire record in this case, we find that the sentence of death was not imposed because of any arbitrary factor, passion, or prejudice. Glossip presented mitigating evidence, which was summarized and listed in an instruction to the jury:

1. The defendant did not have any significant history of prior criminal activity;

2. The defendant is 41 years of age;

3. The defendant's emotional and family history;

4. The defendant, since his arrest on January 9, 1997, has been incarcerated and has not posed a threat to other inmates or detention staff;

5. The defendant is amenable to a prison setting and will pose little risk in such a structured setting;

6. The defendant has a family who love him and value his life;

7. Has limited education and did not graduate from high school. He has average intelligence or above. He has received his G.E.D.;

8. After leaving school, the defendant had continuous, gainful employment from age 16 to his arrest on January 9, 1997;

9. The defendant could contribute to prison society and be an assistance to others;

10. Prior to his arrest, the defendant had no history of aggression;

11. The defendant was not present when Barry Van Treese was killed.

12. The defendant has no significant drug or alcohol abuse history.

¶ 133 In addition, the trial court instructed, that the jury could decide that other mitigating circumstances exist and they could consider them as well.

¶ 134 We can honestly say that the jury's verdict was not born under the influence of passion, prejudice or any other arbitrary factor, and the evidence supported the jury's findings of the aggravating circumstances. *See* 21 O.S.2001, § 701.13. Glossip's convictions and his sentences should be affirmed. We find no error warranting reversal of Glossip's conviction or sentence of death for first-degree murder, therefore, the Judgment and Sentence of the trial court is, hereby, **AFFIRMED.**

C. JOHNSON, V.P.J.: concurs.

LUMPKIN, P.J.: concurs in results.

CHAPEL and A. JOHNSON, JJ.: dissents.

LUMPKIN, Presiding Judge: Concur in Result.

¶ 1 I concur in the results reached by the Court and most of the analysis. However, I do disagree with the analysis on a couple of points.

¶ 2 First, the Court errs by citing as authority for the decision rendered cases from other states that are not valid precedent for this Court. The jurisprudence from this Court is more than sufficient to sustain the analysis and decision of the Court. Thus, that case law should be cited and not cases from irrelevant states.

¶ 3 Second, while I agree the trial court's failure to preserve the demonstrative aids for the record in this case was error, I cannot find error in the use of them in this case. These demonstrative aids, i.e. poster sheets with contemporaneous listing of accurate statements by witnesses, were nothing more than group note taking. And, this Court has pushed note taking with a missionary zeal. While individual note taking cannot be monitored for individual accuracy, this group note taking was monitored by the court and the accuracy ensured. The notes were not overly emphasized because as demonstrative aides, they were not allowed to be taken into the jury room.

CHAPEL, Judge, Dissenting:

¶ 1 I dissent from today's decision because I disagree with the majority's treatment of Proposition III and the result reached on this claim. I also write to note that although I concur in the conclusion reached on Proposition I, I believe the majority overstates the strength of the accomplice corroboration evidence in this case, by confusing the narrow

analysis of this question with Glossip's over-all sufficiency of the evidence claim.

¶ 2 Regarding Proposition III, I find that the trial court's decision, over defense objection, to allow the State to post summaries of witness testimony throughout the courtroom and to leave these demonstrative exhibits visible to jurors and later witnesses, from the time they were first crafted until the conclusion of the first stage of Glossip's trial, was an abuse of discretion. I also find that the trial court's denial of defense counsel's clear and reasonable request to allow these exhibits to be either preserved intact or digitally photographed, for review by this Court, was likewise an abuse of discretion. The trial court's actions in this regard were totally unjustified and prejudiced Glossip's right to a fair trial and an informed consideration of his claims on appeal.

¶ 3 Two things occurred before the presentation of any evidence at Glossip's trial that seem noteworthy in light of his current claim. First, a jury panel venire member asked, during voir dire, if jurors would be allowed to take notes.[1] The trial court responded with a lengthy explanation of the pitfalls of note-taking, particularly for those who did not do it regularly, and explained that witnesses would have to rely upon their "collective memories."[2] Hence juror note-taking was not permitted.[3]

¶ 4 The second noteworthy occurrence involved the rule of sequestration of witnesses. Glossip's counsel properly invoked "the rule" at the beginning of trial and also requested that Kenneth Van Treese, the brother of the victim, not be allowed to remain in the courtroom during the testimony of Donna Van Treese, the victim's wife. The trial court recognized that the rule had been invoked and even acceded to counsel's request regarding Kenneth Van Treese, over State objection, out of "an abundance of caution."[4] Unfortunately, the trial court's recognition that note-taking can sometimes be distracting and create problems during a trial, as well as the court's careful attention to respecting the rule of sequestration, did not remain consistent throughout Glossip's trial.

¶ 5 During the testimony of the State's first witness, Donna Van Treese, the prosecutor got out an easel and started writing on

---

1. This Court addressed the practice of jurors taking notes in *Cohee v. State*, 1997 OK CR 30, 942 P.2d 211 (per curiam). We held that it was not error to allow jurors who took notes during a trial to take their notes into the jury room with them during deliberations. *Id.* at ¶ 5, 942 P.2d at 213. Although *Cohee* did not require trial judges to allow jurors to take notes, it recognized that note-taking has substantial potential benefits during a trial:

> Use of notes may aid the jury during their deliberations. We find that jurors may benefit from notes in several ways: (1) jurors may follow the proceedings more closely and pay more attention as they take notes for later use; (2) jurors' memories may be more easily and reliably refreshed during deliberations; (3) jurors may make fewer requests to have portions of a trial transcript read back during deliberations; and (4) the ability to use their notes may result in increased juror morale and satisfaction.

*Id.* at ¶ 4, 942 P.2d at 212. I would hope that trial courts considering whether to allow jurors to take notes would weigh these potential benefits against the potential risks from this practice.

2. The court stated: "You know, note taking is a skill. If you're in a job or a student where you take notes every day, you get pretty proficient at it and you have a pretty good skill level at it. If it's been years since you've taken notes, you're pretty lousy at it." The court then explained that jurors would not be able to interrupt witnesses and ask them to repeat testimony, in order to ensure the accuracy of their notes, and described a scenario where a juror's written notes conflicted with that juror's memory of what was said: "And then you're confused[,] is what I wrote down right or is it the way I remember it right."

3. The trial judge noted that she would provide jurors with a log of what happened each day, which "really helps" jurors remember what they heard. The record contains a court exhibit with a log of witnesses who testified, with a general description of who they were, such as "girlfriend of defendant," which was given to Glossip's jury. Yet this log contains no summary or other substantive information regarding the actual testimony of the witnesses.

4. The trial court ruled that since there was going to be some overlap between the testimony of these two persons, both of whom were immediate family members of the victim, the victim's brother would be asked to leave the courtroom during the testimony of the victim's wife. (Although the record reveals that Mrs. Van Treese remarried and changed her name in 2003, she is referred to herein, as she was at trial, as Donna Van Treese.)

a large paper pad placed upon it.[5] Although the record does not establish exactly what was written, the prosecutor's comments indicate that she recorded certain specific pieces of testimony on the pad, such as the time Glossip told Mrs. Van Treese that he had last seen her husband and when this statement was made. Defense counsel did not object.[6]

¶ 6 During Mrs. Van Treese's testimony the next day, the prosecutor again began writing on the pad, summarizing certain bits of testimony.[7] In particular, she recorded Mrs. Van Treese's testimony about Glossip telling her that he had seen her husband on the morning of January 7, 1997.[8] Later that day, during the testimony of Glossip's live-in girlfriend, D–Anna Wood, the prosecutor likewise recorded what Glossip told her after Justin Sneed woke them up during the "early

morning hours" of January 7, namely, that "two drunks broke a window" and that Glossip told Sneed "to clean it up." [9]

¶ 7 At the end of the day, after the jury had been dismissed, defense counsel objected to the State being allowed to post, in the courtroom, the large pieces of paper containing the State's notes summarizing particular witness testimony after the testifying witness had been excused, because it placed unfair emphasis on the selected testimony.[10] The State responded that it had a right to make demonstrative exhibits and suggested that it was Glossip's own fault that the exhibits were necessary.[11] The trial court agreed and overruled the objection. The court did not specifically address defense counsel's objection to the posting of the exhibits or his "undue emphasis" complaint.[12]

---

5. As addressed further *infra,* the record in this case does not contain either the actual paper exhibits at issue or any photographs of them. The parties seem to agree, however, that the paper pad, which was used to create the various demonstrative exhibits at issue herein, was approximately 2 feet by 3 feet in size.

6. The transcript in this trial sometimes reveals what was written down, because the prosecutor makes the statement "I have written ..." and then (presumably) states exactly what was written. At other times the examining prosecutor indicates that he/she is recording certain testimony, but then fails to state what exactly he/she has recorded. And it is entirely possible that on some occasions statements were written down without the examining attorney mentioning it at all. Hence the transcript serves as a limited and fundamentally incomplete record of what was written on the large paper demonstrative exhibits at Glossip's trial. I strongly disagree with the majority opinion's suggestion that a careful review of the transcript is "the only way to determine what was on the posters, *in Toto* [sic]." The only way to determine the complete contents of the posters is to review the actual posters.

7. For example, the prosecutor recorded that the hotel bookkeeping (during the second half of 2006) was "not up to par" and also apparently wrote "lifestyle decision not to fire Glossip during family turmoil" and "year-end totals and losses demand change." Although none of these remarks were actual quotes from the witness, these and similar statements that were apparently written down were reasonable summaries of witness testimony and were not challenged, in terms of content, either at trial or on appeal.

8. The prosecutor apparently wrote, "Last time I saw Barry it was on the 7th in the morning

between 7 and 7:30. He was leaving to go to the store and buy some supplies."

9. The record suggests that at some point during the cross examination of Wood, defense counsel wrote on the paper pad as well, since he refers to "1–7," for January 7th, and explains to Wood that "BVT" stands for Barry Van Treese. Yet the transcript is totally unclear what else, if anything, defense counsel wrote down.

10. Defense counsel stated:

We want to make an objection for the record to the posting of demonstrative exhibits that are basically an accumulation of notes written by the prosecutors to remain throughout the course of the variety of witnesses.

I understand the need sometimes for a demonstrative exhibit with a particular witness and then you bringing a demonstrative exhibit out with others, but basically all this does is emphasize the testimony of—it's only part of the testimony. And as a result of that we do object.

11. The prosecutor asserted:

Your Honor, we have a right to make a demonstrative exhibit. I have not and will not move to introduce those exhibits into evidence. This demonstrative exhibit is a running, continuing tally of the various spins that this Defendant has put on, you know, his version of the facts. It's his fault that there are so many of them, there are so many witnesses and people that he talked to.

12. The State asserts on appeal that this Court should review Glossip's claim regarding the posting of the demonstrative exhibits only for "plain error," since Glossip's counsel did not re-raise his objection every time the prosecutor posted a

¶ 8 During the testimony of Billye Hooper, who was the day clerk at the Oklahoma City Best Budget Inn, the prosecutor again began taking notes on the large pad of paper about numerous things Glossip said to her or in her presence: asking her to pay the hotel cable bill with her own money (so Van Treese would not find out it had been disconnected), that Van Treese got up early on the morning of January 7 and went to get breakfast and repair materials, that Barry Van Treese had rented Room 102 to a "couple of drunks," who had "busted out a window," and not to put that room on the housekeeping report, because Glossip and Sneed were going to clean it up themselves.[13] When this testimony began the prosecutor addressed the court saying, "Your Honor, this may take me a minute, but I'm going to try and write all this up here." As the witness testified, the prosecutor would repeatedly summarize and restate what had just been said, in order to get the witness's agreement to the accuracy of the prosecutor's written summary of this same testimony.[14]

¶ 9 During the testimony of the next witness, William Bender, who had managed the Tulsa Best Budget Inn, the prosecutor announced that she was going to start writing down things that Glossip had said to Bender on January 8, after the victim had been found and Glossip had been interviewed. As Bender testified the prosecutor summarized his testimony and got his assent to various quotations of things Glossip had said, as she wrote them down.[15] In the middle of this note-taking process, the court interrupted and called the attorneys to the bench—apparently after the prosecutor wrote down something about Glossip telling Bender that he didn't kill the victim, but that he knew who did—and suggested that the prosecutor add a particular piece of information to her notes, "in the interest of fairness." [16] The prosecutor then apparently recorded that Glossip said he did not tell the police who killed Van Treese because Glossip "was in fear for his life" and that Glossip warned Bender that he should probably leave even the Tulsa motel, because it was about to be "brought down." [17]

¶ 10 This same prosecutor continued taking notes on the paper pad during the testimony of Jacquelyn Williams,[18] Kayla Pursley,[19] and Michael Pursley,[20] as she

new exhibit. Yet on-the-record comments made at the end of the first stage of Glossip's trial indicate that the issue of posting and also of preserving these exhibits may have been further addressed, off the record, at trial. Furthermore, the record indicates that the trial court was fully aware of Glossip's "undue emphasis" objection and had no intention of sustaining it. Hence I find that this claim was adequately preserved at trial.

13. The prosecutor also attempted to record the approximate time at which each of these statements was made by Glossip.

14. In the later part of Hooper's direct testimony, it becomes impossible to tell exactly what, if anything, is being written down, though the favorable nature of Hooper's testimony and the prosecutor's initial remark about wanting to write "all this up here" suggests that the prosecutor may have continued to summarize portions of Hooper's testimony on the paper pad.

15. For example, she wrote down that Glossip described the victim, who had been found the previous evening, as "deader than a doornail," "cold as ice," and "beat to a bloody pulp." The prosecutor also apparently recorded some version of Glossip's remark to Bender that if the police hadn't told him to "stick around," he "would have already been gone."

16. The exchange at the bench was as follows:

> THE COURT: There's one other matter that I think in fairness should be listed up there, which is that he [Glossip] told them [sic] [Bender] that he was in fear for his life.
> MS. SMOTHERMON: Okay. I will.
> THE COURT: And in the interest of fairness, I want to make sure that—if you'll just fix that, please.
> MS. SMOTHERMON: I will.

17. Once again, however, the record does not reveal precisely what was written down.

18. Jacquelyn Williams was a housekeeper who lived in the Best Budget Inn rent-free, but who was not otherwise paid for her services. The transcript only clearly indicates one portion of her testimony that the prosecutor wrote down, namely, that Glossip told her to stay in her room when the owner came around. Yet the prosecutor's style of questioning, repeatedly clarifying particular pieces of information, suggests that she may have been taking notes on other testimony as well.

19. Kayla Pursley worked the night shift at a gas station across from the Best Budget Inn. The transcript makes clear that the prosecutor wrote down that around 8:30 a.m., on January 7, Glos-

questioned each one of them. During Michael Pursley's testimony, as the prosecutor attempted to confirm the accuracy of her notes—by repeating the testimony and asking Pursley to affirm what she had written—defense counsel objected that the prosecutor was "repeating and rehashing testimony that's already before the jury." The court overruled the objection without comment.

¶ 11 Officer Timothy Brown, who assisted in the search for Barry Van Treese and who discovered his body in Room 102, was examined by the other prosecutor. It is not clear whether this prosecutor himself wrote any notes, but after questioning Brown for approximately twenty transcript pages, he asked the first prosecutor to come up and take notes for him. The transcript indicates that this first prosecutor then took notes, while the examining prosecutor continued to question Brown regarding numerous statements made by Glossip and Brown's investigation of Van Treese's disappearance. It is sometimes apparent in the record that the note-taking prosecutor is memorializing testimony—such as when the examining prosecutor asks, "Can we get that, Ms. Smothermon?"—but it is often impossible to tell how much or what exactly is being written down.[21]

¶ 12 Clifford Everhart, who did security work at the hotel and who participated in the search for Mr. Van Treese and was present when his body was discovered, was examined by the "note-taking prosecutor." The transcript indicates some specific occasions during this testimony that the prosecutor took notes summarizing what Glossip had said to Everhart and when it was said.[22] Once again, however, it remains entirely unclear, upon even a careful review of the transcript, whether this prosecutor wrote down other notes from Everhart's testimony, without verbally noting what she was doing.

¶ 13 After all the first-stage evidence had been presented and the jury had been excused, Glossip's counsel noted his earlier objections "to what has been labeled as demonstrative exhibits, which are basically the sheets of paper that have certain writings on them and have been taped to various places in the courtroom."[23] Defense counsel noted that he had earlier requested that these exhibits be included as part of the original record and that the trial court had asked for some authority on this issue. Counsel then

---

sip told Pursley that "there was a fight between two drunks and they had thrown a footstool through the window," and that "one of the drunks was the strange guy that [Pursley] had seen earlier," and that Glossip and Sneed "threw the drunks out." The prosecutor later indicated that she was writing down other testimony "before I forget," which apparently included Glossip's statements to Pursley about the broken window in Room 102, i.e., that he and Sneed "already cleaned that up" and that one of them "got cut." It is unclear whether the prosecutor wrote down other testimony from Kayla Pursley.

20. Michael Pursley had been married to Kayla Pursley and was living with her and their children at the Best Budget Inn at the time. The transcript indicates that the prosecutor wrote down his testimony that around 8:30 a.m., on January 7, Glossip told him that he "knew the window [in Room 102] had been broken," that Glossip and Sneed had "been in the room," and that they knew "who had broken the window" and were "going to bill them for it."

21. Sometimes the record is quite clear about what is being written, such as when the prosecutor quotes Glossip as saying to Brown, "Things keep getting turned around, I didn't say I saw Barry at 7:00 a.m." After getting confirmation of this quote from Brown, the examining prosecutor asks, "Now, did we get that, Ms. Smothermon?", and she responds, "Yes, sir." Yet on other occasions the examining prosecutor asks Brown to confirm "what Ms. Smothermon is writing" and that she "has it right," but fails to review what has been written.

22. The transcript indicates that she wrote down Glossip's statements about Van Treese returning from Tulsa around 2:30 or 3:00 a.m. on the morning of January 7, that Glossip had last seen Van Treese around 7:00 a.m. that same morning, and that Glossip said he had rented Room 102 to "a couple of drunk cowboys," who had gotten into a fight and broken the window.

23. The prosecutor did not challenge defense counsel's description of the paper demonstrative exhibits being "taped to various places in the courtroom." Glossip's appellate brief asserts that according to his trial counsel, "there were at least twelve of the State's posters plastered up across the front of the prosecutor's table, the trial bench, and any other available space in the courtroom." The current record, however, is inadequate to evaluate this specific claim.

cited *Anderson v. State*,[24] as being one of a number of cases establishing the defendant's duty to ensure that an adequate record is provided to the Court of Criminal Appeals, for the determination of claims on appeal. He added:

> If these don't go, then they will not really have an idea of what our concern was in the record. If it's too bulky to do that, we are willing to take some digital photographs of each—first of all, as these things appear in the courtroom and of each of these items to submit if that's an aid to the court reporter or to the Court or the Court of Criminal Appeals. But we do renew that request at this time.

¶ 14 The note-taking prosecutor responded that the record was already clear regarding "what these demonstrative aids entail," because she had "made sure that I put into the record what was being written." The prosecutor noted that "using the same size paper, the same marker, the Defense has made five demonstrative aids of their own of similar ilk, that had been displayed various lengths of time to the jury."[25] She also noted that defense counsel was free to use the demonstrative aids during closing arguments, but that they would not be sent to the jury or included with the record. The prosecutor concluded by again asserting that the record of what had been written down was already complete.[26]

¶ 15 The trial court noted that the actual demonstrative exhibits "would be somewhat bulky," indicated that the record was already "explicit as to what was being memorialized," and denied defense counsel's request. When defense counsel asked for "permission for our own purposes and for our own record to photograph" the challenged exhibits, in case they were later destroyed, the trial court got angry, and the following exchange occurred:

THE COURT: You know what? What you're asking me to do is for permission to make your own record outside of the Court's record. Denied. The Court's record is what's going to stand. And if you want to look them up, you can do so. It's all in the transcript. There is nothing about this that has not been memorialized, and the transcript is the way that we make a record in Oklahoma courts.

MR. WOODYARD: We think the better way to show actually how these things sit in the courtroom and exactly what's written would be to either have the documents or the digital photograph, so we're making that request and I understand the Court's denying our request.

THE COURT: Your understanding is absolutely on target.

¶ 16 It seems to me that the preceding review of the transcript record in this case makes a few thing quite clear (though certainly not the contents of the challenged exhibits). The current record is *not* complete about what was written on the demonstrative exhibits; everything that was written down on these exhibits was *not* memorialized by being read into the record; and the transcripts alone are *not* adequate for a fair review of the current claim on appeal. Defense counsel's request to digitally photograph the demonstrative exhibits, as they appeared in the courtroom, and to either preserve intact or digitally photograph the individual exhibits was entirely reasonable. I conclude the trial court abused its discretion in denying defense counsel's requests in this regard.

¶ 17 Defense counsel was more than diligent in attempting to provide this Court with an adequate record to review his Proposition III claim. Hence we certainly cannot fault

24. *See Anderson v. State*, 1985 OK CR 94, ¶ 4, 704 P.2d 499, 501 ("It is well established that counsel for a defendant has a duty to insure [sic] that a sufficient record is provided to this Court, so that we may determine the issues.") (citation omitted).

25. In particular, the prosecutor described an exhibit recording a statement in which Sneed denied he had killed Van Treese, which was displayed during Sneed's testimony and that of

others. Defense counsel did not dispute the prosecutor's assertion that he had created five demonstrative aids comparable to those made by the State.

26. "I worked very hard to put everything that was written into the record and to make sure that all of their demonstrative aids were read into the record. And I believe the record to be complete."

Glossip for the inadequacy of the current record in this regard. In fact, the majority opinion acknowledges being "extremely troubled by the trial court's attitude toward defense counsel's attempt to preserve the demonstrative aides for appellate review." And I agree with the majority that "[t]he total recalcitrance of the trial court to allow a record to be made creates error in itself." Consequently, I cannot understand the majority's summary conclusion—made without attempting to review the actual exhibits at issue—that "[a]ny error in the utilization of these posters was harmless."

¶ 18 The State has represented to this Court that it still has the actual poster exhibits from Glossip's trial.[27] In his reply brief, Glossip requests that we order the State to supplement the record with these actual exhibits. In my view, if we are going to deny Glossip's claim, we should not do so without at least reviewing the actual demonstrative exhibits, if they are still available, particularly since Glossip's counsel diligently sought to have these exhibits included in the appellate record.

¶ 19 The rub, of course, is that Glossip does not (and did not) challenge the accuracy of the notes taken by the prosecutor at trial, nor does he raise a prosecutorial misconduct claim in this regard. Glossip's claim in Proposition III is that the posted exhibits of the prosecutor's notes from selected witness testimony (1) placed undue emphasis on the chosen testimony, (2) violated the rule of sequestration of witnesses, and (3) amounted to a "continuous closing argument." Reviewing the actual paper exhibits could potentially help us resolve these claims, but such a

review might not be decisive, particularly since this Court still would not know how the various exhibits were displayed in the courtroom. I take up Glossip's claims in turn, based upon the limited record currently before the Court.

¶ 20 First, I agree that the manner in which the State was allowed to record and post selected witness testimony, in the context of Glossip's capital trial, placed undue emphasis upon this testimony. While this Court has repeatedly approved the use of demonstrative exhibits, including summaries of witness testimony, to aid the jury in its consideration of evidence, we have also recognized that demonstrative exhibits can be misleading and can be misused in the trial setting.[28] In *Moore v. State*,[29] we addressed a claim that the State's use of a written summary of an expert witness's testimony placed "undue emphasis" on the summarized evidence. We rejected the claim, based upon the fact that the jurors only had access to the summary during the time that the expert witness was actually testifying.[30] We also noted that the summary assisted the trier of fact, since it helped explain "the extensive fiber evidence in the case at bar."[31] The current case is distinguishable on its facts.

¶ 21 Glossip's jury was able to review the State's hand-written summaries of witness testimony long after the testifying witnesses left the stand, throughout the first stage of his trial. Furthermore, despite the State's desire to catalog and display its favorite testimony, such recording can hardly be described as "necessary" for the jury's understanding in this case. Although the trial was long and many witnesses testified, the evi-

---

27. Appellate counsel for Glossip, however, apparently does not possess the poster exhibits that were made by defense counsel at Glossip's trial.

28. *See, e.g., Dunkle v. State*, 2006 OK CR 29, ¶ 64, 139 P.3d 228, 249 (finding that State's use of demonstrative exhibits, in the form of computer-generated animations or "reenactments," was "inappropriate and highly misleading"). This Court recognized in *Dunkle* that even though demonstrative exhibits "should not be made available for the jury during deliberations, as they have 'no independent evidentiary value,'" such demonstrative aids must nevertheless be authenticated and evaluated to determine whether they are relevant and whether their probative

value is outweighed by the danger of unfair prejudice or by other trial considerations (confusion of the issues, undue delay, cumulative evidence, *etc.*). *Id.* at ¶¶ 53–54, 139 P.3d at 246–47 (citation omitted). Demonstrative exhibits that summarize witness testimony can be authenticated by demonstrating that the summary provided/created is consistent with the witness's testimony.

29. 1990 OK CR 5, 788 P.2d 387.

30. *Id.* at ¶ 44, 788 P.2d at 398.

31. *Id.*

dence summarized did not relate to complex expert testimony or to concepts that were not readily accessible to average citizens. And even if the actual demonstrative exhibits are uncontroversial—and Glossip has never challenged the State's right to create them—there was absolutely no justification for allowing them to remain in the courtroom throughout the taking of first-stage evidence in Glossip's trial.[32] I conclude that the trial court's decision to allow the continuous posting of these exhibits, without any limitation and over defense objection, was an abuse of discretion, because it placed undue and unfair emphasis on the summarized testimony.

¶ 22 I also conclude that the posting of these hand-written summaries during the testimony of later witnesses violated the rule of sequestration of witnesses. This rule is codified at 12 O.S.2001, § 2615, and was properly invoked by defense counsel at trial.[33] The purpose of this rule is fairly obvious and is well established: "It exercises a restraint on witnesses tailoring their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid."[34] The State's argument that the posted exhibits did not violate the rule of sequestration because the later witnesses couldn't actually "hear" the testimony of earlier witnesses—they would have to read it—is ridiculous in my view. It would certainly violate the rule of sequestration to provide a later witness with a transcript of an earlier witness's trial testimony, and what occurred in Glossip's trial was a limited version of this same phenomenon.

¶ 23 Furthermore, the possibility of a later witness learning about the testimony of earlier witnesses through these lingering exhibits was more than a theoretical danger in this case. The testimony of Kenneth Van Treese made quite clear that he was reading and responding to the posted testimony of the witnesses who preceded him.[35] Hence the posting of the demonstrative exhibits violated the rule of sequestration of witnesses as well.

¶ 24 I also agree that the overall effect of the posted summaries of the State's favorite testimony was akin to allowing the State to post its theory of the case and to make its closing argument throughout the first stage of Glossip's trial.[36] Hence I conclude that the trial court abused its discretion in allowing the State, over defense objection, to display the prosecutor's written summaries of selected witness testimony throughout the

32. In *Lanning v. Brown*, 377 S.W.2d 590 (Ky. 1964), Kentucky's highest state court noted that although it was proper to display a chart summarizing an injured victim's testimony about her damages during that witness's testimony, "it is quite another thing to allow a particular segment of testimony to be advertised, bill-board fashion, after the living witness has vacated the stand," particularly if the exhibit "is not being used in connection with the subsequent testimony of other witnesses." *Id.* at 594. The *Lanning* court concluded that the trial court erred in allowing the damages demonstrative exhibit to remain visible in the courtroom, over objection, throughout the remainder of the trial. *Id.* Because the amount of damages was not in dispute, however, the court found that the error did not prejudice the defendants in that case and granted no relief. *Id.*

33. *See* 12 O.S.2001, § 2615 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses."). This rule is also known as "the rule of exclusion" and is typically invoked at trial by referring simply to "the rule." While there are exceptions to this rule, both statutory and by common law, none are relevant in this case.

34. *Clark v. Continental Tank Co.*, 1987 OK 93, ¶ 6, 744 P.2d 949, 951 (quoting *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592). The *Clark* opinion notes that the practice of sequestering witnesses, in order to seek the truth, goes "as far back as the days of Daniel and the story of Susanna." *Id.* at ¶ 5, 744 P.2d at 950–51.

35. When Kenneth Van Treese was asked what Glossip said to him on January 8, 1997, regarding the disappearance of Barry Van Treese, he responded: "He [Glossip] told me the same thing that these notes up here are about. About having seen Barry at 7:00, you know, blah, blah, and so forth." In other words, he told me the same lame story that he told the other witnesses, as we all can see from these posted summaries of their testimony.

36. *See, e.g.*, *Vanlandingham v. Gartman*, 236 Ark. 504, 367 S.W.2d 111, 114 (1963) ("[A]lthough an attorney might use a chart or blackboard to illustrate his argument, it would not be fair to place the illustration where it could be seen by the jury at times when the attorney was not using it in making his argument. If the jury could see it all day[,] it would be the same as arguing the case all day.").

courtroom—and apparently visible to both jurors and testifying witnesses—without any limitation and throughout the evidentiary portion of the guilt stage of Glossip's trial. And I find merit in each of Glossip's three challenges to this decision. Although it is difficult to confidently evaluate the prejudice from this trial court error, I strongly dissent from the majority opinion's summary finding that any error in this regard was "harmless," particularly when we do not even seek to review the actual demonstrative exhibits at issue.

¶ 25 Regarding Proposition I, I strongly disagree with the majority opinion's treatment of Glossip's challenge to the accomplice corroboration evidence in this case. In *Pink v. State,*[37] a case that the majority opinion barely acknowledges, this Court recently summarized and clarified Oklahoma's corroboration requirement for cases involving accomplice testimony, found at 22 Okla.Stat. 2001, § 742.[38] As we noted in *Pink,* in cases where the State relies upon accomplice testimony, the defendant can only be convicted where the State also presents evidence that "standing alone, tends to link the defendant with the commission of the offense charged."[39] Hence the State must present "at least one material fact of independent evidence that tends to connect the defendant with the commission of the crime," which is entirely separate from the accomplice testimony, but which corroborates some material aspect of that testimony.[40] We noted in *Pink* that this Court has in the past found the following independent evidence to be adequately corroborating: "evidence of stolen goods found in the defendant's possession, the testimony of non-accomplice associates of the defendant, [and] admissions by the defendant."[41] This Court has never found that evidence that a defendant had a motive to commit a particular crime or that he helped conceal a crime committed by another is enough, standing alone, to link that defendant with the actual commission of the crime at issue. Yet this is the "corroboration" evidence focused upon in today's majority opinion.[42]

¶ 26 The Court's opinion initially notes that "[t]he State concedes that motive alone is not sufficient to corroborate an accomplice's testimony." Yet the opinion then attempts to demonstrate, by relying on cases from Texas, California, and Georgia, that evidence of a defendant's motive, as well as evidence about concealing the commission of a crime and attempted flight, can be adequate as corroborating evidence. These cases are entirely irrelevant to interpreting Oklahoma's very specific, accomplice corroboration statute.[43] And the majority opinion does not cite any Oklahoma authority for (or make a persuasive argument for) its assumption that non-accomplice evidence suggesting that a defendant had a motive to commit a crime, assisted the perpetrator in concealing a crime, or planned to leave the area afterward can qualify as adequate corroborating evidence linking a defendant to the actual commission of the crime under 22 O.S.2001, § 742.[44]

---

37. 2004 OK CR 37, 104 P.3d 584.

38. 22 O.S.2001, § 742 ("A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.").

39. 2004 OK CR 37, ¶ 15, 104 P.3d at 590 (quoting *Cummings v. State,* 1998 OK CR 45, ¶ 20, 968 P.2d 821, 830).

40. *Id.* at ¶ 16, 104 P.3d at 590 (internal citations omitted). The State's brief quotes paragraphs 15 and 16 of *Pink* in their entirety.

41. *Id.* at ¶ 20, 104 P.3d at 592 (citing cases).

42. The opinion initially refers to "four ... aspects of Glossip's involvement, ... which point to his guilt: motive, concealment of the crime, intended flight, and ... his control over Sneed." Yet after reviewing the evidence on these four issues, the opinion concludes that this evidence, "taken together," is not merely indicative of guilt under a traditional sufficiency-of-the-evidence analysis, it is adequate to "corroborate Sneed's story about Glossip's involvement in the murder" and "sufficiently ties Glossip to the commission of the offense."

43. The State notes in its brief, correctly, that "Defendant's challenge to the accomplice testimony in this case rests on pure state law grounds."

44. The opinion does not cite any authority for (or even fully develop) its contention that evidence of a defendant's "control" over the perpetrator can be adequate corroboration.

¶ 27 In fact, this Court has specifically held that evidence implicating a defendant as an "accessory after the fact"—through his actions of helping dispose of the victim's body, lying to the police, and attempting to conceal a murder that he had directed others to commit—is *not* adequate to "independently connect him to the actual commission of [the] murder," under Oklahoma's accommodation requirement.[45] The facts of *Cummings* are quite similar to the current case. Cummings apparently directed both of his wives to kill his sister by shooting her, but was not present when the murder was committed by his second wife. When he returned home, he assisted in the disposal of his sister's body and lied to the police about it.[46] Despite the strong evidence of Cummings's guilt, including the testimony of both of his (accomplice) wives, this Court reversed his conviction for murdering his sister based upon the accomplice corroboration rule.[47]

¶ 28 This Court's 2001 opinion in this case, in which we reversed Glossip's conviction based upon ineffective assistance of counsel,[48] emphasized the minimal nature of the corroborating evidence in this case. We stated: "The evidence at trial tending to corroborate Sneed's testimony was extremely weak."[49] We also characterized certain inadmissible double hearsay testimony as "arguably the only evidence presented at trial that tended to independently corroborate any portion of Justin Sneed's testimony implicating Appellant in the crime and establishing a motive."[50] We declined to reach the question of the adequacy of corroboration, however, choosing instead to reverse on Glossip's ineffective assistance claim.[51]

¶ 29 The current opinion, after recognizing the corroboration requirement, takes a very different tone: "In this case, the State presented a compelling case which showed that Justin Sneed place himself in a position where he was totally dependent on Glossip." Of course that has nothing to do with independent evidence linking Glossip to the actual commission of the murder of Barry Van Treese. The opinion then discusses Sneed's accomplice testimony and the State's case as a whole. I believe that we must first focus upon the very narrow question of whether the State presented separate evidence, independent of the testimony of Sneed, that connects Glossip to the actual murder and that materially corroborates some aspect of Sneed's accomplice testimony.

¶ 30 Although the question is very close, I agree with the majority that "the most compelling corroborative evidence . . . is the discovery of the money in Glossip's possession." Unfortunately, this single, conclusory sentence represents the entirety of the Court's analysis on this critical issue. I offer the following as an alternative, more narrow resolution of this issue.

¶ 31 According to the record in this case, when Glossip was questioned and then arrested on January 9, 1997, he was carrying $1,757 in cash, approximately $1,200 of which could not be accounted for by Glossip.[52]

---

**45.** *See Cummings v. State,* 1998 OK CR 45, ¶ 21, 968 P.2d 821, 830.

**46.** *Id.* at ¶¶ 2–11, 968 P.2d at 827–28.

**47.** *Id.* at ¶ 21, 968 P.2d at 830 ("As Appellant contends, outside of the testimony of Juanita and Sherry, the evidence only supports a finding that Appellant assisted his wives in lying to the police and in covering up the crime. It does not independently connect him to the actual commission of Judy Mayo's murder."). This Court upheld Cummings's conviction for the murder of his niece, however, because his second wife was not an accomplice to this separate murder; hence her testimony provided adequate independent evidence corroborating the testimony of Cummings's first wife (who was an accomplice) regarding the murder of their niece. *Id.* at ¶¶ 22–23, 968 P.2d at 830–31.

**48.** *See Glossip v. State,* 2001 OK CR 21, 29 P.3d 597.

**49.** *Id.* at ¶ 8, 29 P.3d at 599. We also noted that "the only 'direct evidence' connecting Appellant to the murder was Sneed's trial testimony," and that "[n]o forensic evidence linked Appellant to [the] murder and no compelling evidence corroborated Sneed's testimony that Appellant was the mastermind behind the murder." *Id.* at ¶ 7, 29 P.3d at 599.

**50.** *Id.* at ¶ 21, 29 P.3d at 602.

**51.** *Id.* at ¶ 8, 29 P.3d at 599.

**52.** On the evening of January 6, 1997, Van Treese paid Glossip for his work in December of 1996 with a check for $429.33. According to Glossip's girlfriend, she and Glossip paid a 10%

Such unaccounted-for cash, when not uniquely identified by serial number or some other marking, is not nearly as strongly corroborating as the presence of identifiable stolen goods that are found in the defendant's possession. Nevertheless, considering this case as a whole, including the State's evidence that Glossip was a person of very limited means, who was low on cash at the time, and the timing of his arrest, I agree that this evidence materially corroborated Sneed's testimony.[53] The evidence regarding Glossip's paycheck, sales, and purchases, which could not explain where he obtained approximately $1200 of the cash in his possession at the time of his arrest, materially corroborated Sneed's testimony that Glossip offered him money to kill Van Treese and then paid Sneed for accomplishing the murder, using half of the cash stolen from Van Treese's car, and then kept the remaining stolen money for himself.[54] As noted in *Pink*, this Court has "not required that the *quantity* of the independent evidence connecting the defendant to the crime be great, though we have insisted that the evidence raise more than a mere suspicion." [55] I conclude that the amount of unaccounted-for cash found in Glossip's possession two days after the mur-

der does tend to directly link him to this murder-for-hire killing and adequately corroborates the testimony of his accomplice, Justin Sneed.

¶ 32 Although the issue is close, I conclude that the facts of this case are distinguishable from *Pink*, wherein we reversed the defendant's conviction for robbery with a dangerous weapon because the State did not present adequate independent evidence connecting Pink to the armed robbery at issue.[56] I also find the *Pink* case distinguishable because the prosecutor in that case argued to the jury, contrary to well-established Oklahoma law, that the jury was *not* required to find the existence of evidence, separate from the testimony of any accomplices, that tended to connect the defendant with the commission of the offense.[57] This argument prompted us to revise the language of OUJI–CR(2d) 9–32, upon which the prosecutor in *Pink* had based her argument.[58] Although Glossip's trial was conducted using the pre-*Pink* version of this instruction, the prosecutor in his case specifically acknowledged, during closing argument, that Glossip's jury was required to find adequate corroborating evi-

fee to cash the check on January 7, which would have left them with $386.40. They then went shopping and spent $172 for a pair of glasses, $107.73 for an engagement ring for her, and $45 more at Wal–Mart. These purchases would have left Glossip with only $61.67 from his paycheck. It can be reasonably inferred from the evidence that Glossip was very low on cash before being paid, because earlier in the day on January 6, he took a $20 advance from the hotel against the paycheck he was about to receive, to get through the day. In addition, Glossip's girlfriend told an investigator that they lived paycheck to paycheck and that she did not think Glossip was able to save any money.

Glossip later stated, during an interview in June of 1998, that just before he was arrested in this case, he sold his TV and futon for $190, sold his vending machines for $200, and sold an aquarium for $100, for a total of $490. If Glossip still had all of this cash, plus the money leftover from his paycheck at the time of his arrest, he would have had approximately $552 in cash.

53. The finding of "stolen goods" in the defendant's possession is one of the examples of independent corroborating evidence noted in *Pink*. 2004 OK CR 37, ¶ 20, 104 P.3d at 592.

54. The State presented evidence at trial that Barry Van Treese would have had $3500 to $4000 in cash in his possession, based on hotel receipts. Justin Sneed testified that the envelope he found under the front seat of Van Treese's car, where Glossip told him to look, contained approximately $4,000 in cash, which Glossip split evenly between Sneed and himself. When Sneed, who had no regular source of income, was apprehended one week later, he told investigators that he still had some of the money that he had been paid and where it could be found. When investigators searched the apartment to which Sneed directed them, they found a Crown Royal Bag containing $1,680 in cash in a drawer that Sneed was using while he stayed in the apartment.

55. 2004 OK CR 37, ¶ 16, 104 P.3d at 590 (emphasis in original). We also noted in *Pink* that "circumstantial evidence can be adequate to corroborate an accomplice's testimony." *Id.* at ¶ 16, 104 P.3d at 590–91.

56. *See Pink*, 2004 OK CR 37, ¶¶ 17–20, 104 P.3d at 591–92.

57. *Id.* at ¶ 22, 104 P.3d at 592.

58. *Id.* at ¶ 23, 104 P.3d at 593.

dence in order to convict him of murder. Hence Glossip's jury was not misled in this regard.

¶ 33 It is important to distinguish the adequate corroboration requirement found in 22 Okla. Stat.2001, § 742, which applies only to cases involving accomplice testimony, from the general sufficiency of the evidence standard, which can be applied to any conviction. After the independent corroboration standard has been met for any accomplice testimony, this Court can and will consider all the evidence presented at trial, including accomplice testimony, to determine whether sufficient evidence was presented to convict the defendant.[59] In this regard, I agree with the majority that the State presented a strong circumstantial case against Glossip, which when combined with the testimony of Sneed directly implicating Glossip, was more than adequate to sustain his conviction for the first-degree murder of Barry Van Treese.

¶ 34 Nevertheless, I dissent from today's decision based upon my analysis of Glossip's Proposition III claim.

A. JOHNSON, Judge, Dissenting:

¶ 1 I dissent for the reasons well expressed in Judge Chapel's dissenting opinion.

---

59. Hence although I reject the majority opinion's suggestion that Glossip's failure to immediately disclose his knowledge of Van Treese's murder and his misleading of the investigation can serve as adequate corroborating evidence under § 742, I agree that this evidence can be considered as going to consciousness of guilt within our overall sufficiency of the evidence analysis, after adequate corroboration is established.

¶ 2 Providing visual aids for the jury is a common trial practice. Done right, it focuses the jurors' attention, enhances their understanding, and sharpens their memory. Done right, it is an important part of a fair and well run trial.

¶ 3 Here, in the image of an American courtroom plastered with poster-size trial notes taken by the prosecutor, we see the practice gone badly wrong.

¶ 4 The process allowed the prosecution, in effect, a continuous closing argument, and may well have violated the rule of sequestration of witnesses. This Court cannot judge the effect of the process on this defendant's right to a fair trial with any assurance because the trial court refused the defendant's request to have the posters and their placement in the courtroom made part of the appellate record. Under those circumstances, we should not assume this error was harmless.